# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

WHEATON COLLEGE                            )
501 College Avenue                         )
Wheaton, IL 60187-5593,                    )
                                           )
    *Plaintiff,*                           )
                                           )
v.                                         )
                                           )
KATHLEEN SEBELIUS, Secretary               )
of the United States Department of         )
Health and Human Services, UNITED          )    Civ. Action No. _____
STATES DEPARTMENT                          )
OF HEALTH AND HUMAN                        )    **COMPLAINT**
SERVICES, HILDA SOLIS, Secretary of        )
the United States Department of Labor,     )    **Jury demanded**
UNITED STATES DEPARTMENT OF                )
LABOR, TIMOTHY GEITHNER,                   )
Secretary of the United States Department  )
of the Treasury, and UNITED STATES         )
DEPARTMENT OF THE TREASURY,                )
                                           )
    *Defendants*.                         )
_____)

Eric N. Kniffin (DC Bar No. 999473)
S. Kyle Duncan (LA Bar No. 25038)
  (*pro hac vice* application to be filed)
Mark Rienzi (DC Bar No. 494336)
Lori Halstead Windham (DC Bar No. 501838)
The Becket Fund for Religious Liberty
3000 K St. NW
Suite 220
Washington, DC 20007
(202) 955-0095
(202) 955-0090
ekniffin@becketfund.org

*Counsel for Plaintiff*

Comes now Plaintiff Wheaton College, by and through its attorneys, and states as follows:

## NATURE OF THE ACTION

1.   This is a challenge to regulations issued under the 2010 "Affordable Care Act" that force thousands of religious organizations to violate their deepest religious beliefs.

2.   Plaintiff Wheaton College ("Wheaton" or "the College") is a Christian liberal arts college located in Wheaton, Illinois. Wheaton's religious beliefs forbid it from participating in, providing access to, paying for, training others to engage in, or otherwise supporting abortion. Wheaton is among the many American religious organizations that hold these beliefs.

3.   With full knowledge of these beliefs, the government issued an administrative rule ("the Mandate") that runs roughshod over Wheaton's religious beliefs, and the beliefs of millions of other Americans, by forcing it to provide health insurance coverage for abortifacient drugs and related education and counseling.

4.   The government's Mandate unconstitutionally coerces Wheaton to violate its deeply-held religious beliefs under threat of heavy fines and penalties. The Mandate also forces Wheaton to facilitate government-dictated speech that is incompatible with its own speech and religious teachings. Having to pay a penalty to the taxing authorities for the privilege of practicing one's religion or controlling one's own speech is un-American, unprecedented, and flagrantly unconstitutional.

5.   The government's refusal to accommodate conscience is also highly selective. The government obviously does not believe every single insurance plan in the country needs to cover these services. Rather, the government has provided *thousands* of exemptions from the Affordable Care Act for other groups, including large corporations, often for reasons of

commercial convenience. And the government allows a variety of other reasons—from the age of the plan to the size of the employer—to qualify a plan for an exemption. But the government refuses to give the same level of accommodation to groups exercising their fundamental First Amendment freedoms.

6.   Defendants' actions therefore violate Wheaton's right to freedom of religion, as secured by the First Amendment of the United States Constitution and the Religious Freedom Restoration Act ("RFRA").

7.   Defendants' actions also violate Wheaton's right to the freedom of speech, as secured by the First Amendment of the United States Constitution.

8.   Furthermore, the Mandate is also illegal because it was imposed by Defendants without prior notice or sufficient time for public comment, and otherwise violates the Administrative Procedure Act, 5 U.S.C. § 553.

9.   Had Wheaton's religious beliefs been obscure or unknown, the government's actions might have been an accident. But because the government acted with full knowledge of those beliefs, and because it allows plans not to cover these services for a wide range of reasons *other than* religion, the Mandate can be interpreted as nothing other than a deliberate attack by the government on the religious beliefs of Wheaton and millions of other Americans. Wheaton seeks declaratory and injunctive relief to protect against this attack.

## JURISDICTION AND VENUE

10. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and § 1361. This action arises under the Constitution and laws of the United States. This Court has jurisdiction to

render declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202, and 42 U.S.C. § 2000bb-1.

11. Venue lies in this district pursuant to 28 U.S.C. § 1391(e). A substantial part of the events or omissions giving rise to the claim occurred in this district, and Defendants are all located in this district.

## IDENTIFICATION OF PARTIES

12. Plaintiff Wheaton College is a liberal arts college in Wheaton, Illinois. Founded in 1860 by abolitionist Jonathan Blanchard, the College's mission is "to help build the church and improve society worldwide by promoting the development of whole and effective Christians through excellence in programs of Christian higher education."

13. Defendants are appointed officials of the United States government and United States governmental agencies responsible for issuing the Mandate.

14. Defendant Kathleen Sebelius is the Secretary of the United States Department of Health and Human Services ("HHS"). In this capacity, she has responsibility for the operation and management of HHS. Sebelius is sued in her official capacity only.

15. Defendant HHS is an executive agency of the United States government and is responsible for the promulgation, administration and enforcement of the Mandate.

16. Defendant Hilda Solis is the Secretary of the United States Department of Labor. In this capacity, she has responsibility for the operation and management of the Department of Labor. Solis is sued in her official capacity only.

17. Defendant Department of Labor is an executive agency of the United States government and is responsible for the promulgation, administration, and enforcement of the Mandate.

18. Defendant Timothy Geithner is the Secretary of the Department of the Treasury. In this capacity, he has responsibility for the operation and management of the Department. Geithner is sued in his official capacity only.

19. Defendant Department of Treasury is an executive agency of the United States government and is responsible for the promulgation, administration, and enforcement of the Mandate.

**FACTUAL ALLEGATIONS**

**I.   Wheaton's Religious Beliefs and Practices Related to Insurance for Abortion.**

20. Wheaton College is a liberal arts college located in Wheaton, Illinois. It was founded in 1860 by abolitionist Jonathan Blanchard.

21. Today, Wheaton College "is an institution of higher learning, a rigorous academic community that takes seriously the life of the mind." See http://www.wheaton.edu/About-Wheaton/Community-Covenant. Wheaton offers 59 undergraduate degree programs and 22 graduate degree programs, including five doctoral programs.

22. Faith is central to the education mission of Wheaton College. The College aspires "to live, work, serve, and worship together as an educational community centered around the Lord Jesus Christ." Wheaton College, Community Covenant, http://www.wheaton.edu/about-wheaton/community-covenant.

23. Wheaton College's purpose is expressed in its mission statement: "Wheaton College exists to help build the church and improve society worldwide by promoting the development of whole and effective Christians through excellence in programs of Christian higher education."

24. Wheaton College's motto is "For Christ and His Kingdom."

25. In order to further its mission, Wheaton has a longstanding conviction that appropriate "institutional standards" help to "foster the kind of campus atmosphere most conductive to becoming the Christian community of living, learning, and serving that Wheaton College aspires to be."

26. Each year, all Wheaton College students and full-time employees commit themselves to this community by signing Wheaton College's Community Covenant.

27. In addition to signing the Community Covenant, Wheaton requires its Board of Trustees, faculty, and staff to annually reaffirm the College's doctrinal statement, which provides a summary of biblical doctrine that is consonant with Evangelical Christianity. See http://www.wheaton.edu/About-Wheaton/Statement-of-Faith-and-Educational-Purpose.

28. Wheaton College's Community Covenant recognizes that Scripture condemns the taking of innocent life. (Wheaton College, Community Covenant, http://www.wheaton.edu/about-wheaton/community-covenant.)

29. Wheaton College holds religious beliefs that include traditional Christian teachings on the sanctity of life. Wheaton believes and teaches that each human being bears the image and likeness of God, and therefore that all human life is sacred and precious, from the moment of conception. Wheaton College therefore believes and teaches that abortion ends a human life and is a sin.

30. Wheaton College is registered as a tax-exempt organization under 26 U.S.C. § 501(c)(3).

31. Wheaton College is not a church, an integrated auxiliary of a church, or a convention or association of churches as defined by 26 U.S.C. § 6033(a)(3)(A)(i).

32. Wheaton College is not a religious order as defined by 26 U.S.C. § 6033(a)(3)(A)(iii).

33. Wheaton College is not a church or a convention or association of churches as defined by 26 U.S.C. § 414(e).

34. Wheaton College has about 2,400 undergraduate and 600 graduate students.

35. Wheaton has about 709 full-time and 161 part-time employees as of June 30, 2012.

36. As part of its religious convictions, Wheaton College promotes the well-being and health of its employees. This includes provision of generous health services and health insurance for its employees.

37. Wheaton College's religious beliefs prohibit it from deliberately providing insurance coverage for drugs, procedures, or services inconsistent with its faith, in particular abortion-inducing drugs, abortion procedures, and related services.

38. It is similarly a violation of Wheaton College's religious beliefs to deliberately provide health insurance that would facilitate access to abortion-causing drugs, abortion procedures, and related services, even if those items were paid for by an insurer or a plan administrator and not by Wheaton College.

39. Wheaton College has no conscientious objection to providing coverage for non-abortion-causing contraceptive drugs and devices.

40. Wheaton College has expended significant resources working with its insurers and plan administrators to ensure that its health insurance policies reflect the College's religious beliefs.

41. On September 27, 2011, Wheaton College submitted public comments on the Interim Final Rule on Preventative Services published on August 3, 2011 (76 Fed. Reg. 46621).[1]

---

[1]    Letter from President Philip G. Ryken, President, Wheaton College, to IRS Commissioner Douglas H. Shulman (Sept. 27, 2011), available at http://www.regulations.gov/#!documentDetail;D=IRS-2010-0017-0975.

Wheaton's comments expressed its concern that the interim final rule failed to recognize it as a religious employer and that the rule violates the College's rights of conscience.

42. On June 19, 2012, Wheaton College submitted public comments on the Advance Notice of Proposed Rulemaking on Preventative Services published on March 21, 2012 (77 Fed. Reg. 16501). Wheaton's comments reiterated its concerns about the interim final rule, particularly the Defendants' refusal to provide it and similar religious employers with the same exemption afforded to churches.

43. The plan year for Wheaton College's employee insurance plans begins on January 1 of each year.

44. Wheaton College made certain changes to its employee insurance plans effective April 1, 2012, that render Wheaton healthcare plans ineligible for grandfathered status. *See* 45 C.F.R. § 147.140(a)(1)(i), 26 C.F.R. § 54.9815-1251T(a)(1)(i); 29 C.F.R. § 2590.715-1251(a)(1)(i). In particular, Wheaton removed coverage for prescription drugs from two of its employee insurance plans and created new drug benefit plans for employees. None of these plans are grandfathered.

## II. The Affordable Care Act

45. In March 2010, Congress passed, and President Obama signed into law, the Patient Protection and Affordable Care Act, Pub. L. 111-148 (March 23, 2010), and the Health Care and Education Reconciliation Act, Pub. L. 111-152 (March 30, 2010), collectively known as the "Affordable Care Act."

46. The Affordable Care Act regulates the national health insurance market by directly regulating "group health plans" and "health insurance issuers."

47. The Act does not apply equally to all plans.

48. The Act does not apply equally to all insurers.

49. The Act does not apply equally to all individuals.

50. The Act applies differently to employers with fewer than 50 employees, not counting seasonal workers. 26 U.S.C. § 4980H(c)(2)(A).

51. According to the United States census, more than 20 million individual workers are employed by firms with fewer than 20 employees. http://www.census.gov/econ/smallbus.html. Employers with less than 50 employees would therefore employ an even higher number of workers.

52. Certain provisions of the Act do not apply equally to members of certain religious groups. *See*, *e.g.*, 26 U.S.C. §§ 5000A(d)(2)(a)(i) and (ii) (individual mandate does not apply to members of "recognized religious sect or division" that conscientiously objects to acceptance of public or private insurance funds); 26 U.S.C. § 5000A(d)(2)(b)(ii) (individual mandate does not apply to members of "health care sharing ministry" that meets certain criteria).

53. The Act's preventive care requirements do not apply to employers who provide so-called "grandfathered" health care plans.

54. Employers who follow HHS guidelines may continue to use grandfathered plans indefinitely.

55. HHS has predicted that a majority of large employers, employing more than 50 million Americans, will continue to use grandfathered plans through at least 2014, and that a third of small employers with between 50 and 100 employees may do likewise. http://www.healthcare.gov/news/factsheets/2010/06/keeping-the-health-plan-you-have-grandfathered.html.

56. The Act is not generally applicable because it provides for numerous exemptions from its rules.

57. The Act is not neutral because some groups, both secular and religious, enjoy exemptions from the law, while certain religious groups do not.

58. The Act creates a system of individualized exemptions.

59. The Department of Health and Human Services has the authority under the Act to grant compliance waivers to employers and other health insurance plan issuers ("HHS waivers").

60. HHS waivers release employers and other plan issuers from complying with the provisions of the Act.

61. HHS decides whether to grant waivers based on individualized waiver requests from particular employers and other health insurance plan issuers.

62. Upon information and belief, thousands of HHS waivers have been granted.

63. The Act is not neutral because some secular and religious groups have received statutory exceptions while other religious groups have not.

64. The Act is not neutral because some secular and religious groups have received HHS waivers while other religious groups have not.

65. The Act is not generally applicable because Defendants have granted numerous waivers from complying with its requirements.

66. The Act is not generally applicable because it does not apply equally to all individuals and plan issuers.

67. Defendants' waiver practices create a system of individualized exemptions.

**III. The Preventive Care Mandate**

68. One of the provisions of the Affordable Care Act mandated that health plans "provide coverage for and shall not impose any cost sharing requirements for . . . with respect to women, such additional preventive care and screenings . . . as provided for in comprehensive guidelines supported by the Health Resources and Services Administration" and directed the Secretary of Health and Human Services to determine what would constitute "preventative care" under the mandate. 42 U.S.C § 300gg–13(a)(4).

69. On July 19, 2010, HHS, along with the Department of Treasury and the Department of Labor, published an interim final rule under the Affordable Care Act. 75 Fed. Reg. 41726 (2010).[2] The interim final rule required providers of group health insurance to cover preventive care for women as provided in guidelines to be published by the Health Resources and Services Administration at a later date. 75 Fed. Reg. 41759 (2010).

70. The Mandate also requires group health care plans and issuers to provide education and counseling for all women beneficiaries with reproductive capacity.

71. The Mandate went into effect immediately as an "interim final rule."

72. HHS accepted public comments to the 2010 interim final rule until September 17, 2010. A number of groups filed comments warning of the potential conscience implications of requiring religious individuals and groups to pay for certain kinds of health care, including contraception, sterilization, and abortion.

73. HHS directed a private health policy organization, the Institute of Medicine ("IOM"), to suggest a list of recommended guidelines describing which drugs, procedures, and services

---

[2] For ease of reading, references to "HHS" in this Complaint are to all three Departments.

should be covered by all health plans as preventive care for women. *See* http://www.hrsa.gov/womensguidelines.

74. In developing its guidelines, IOM invited a select number of groups to make presentations on the preventive care that should be mandated by all health plans. These were the Guttmacher Institute, the American Congress of Obstetricians and Gynecologists (ACOG), Prof. John Santelli, a Senior Fellow at the Guttmacher Institute, the National Women's Law Center, National Women's Health Network, Planned Parenthood Federation of America and Prof. Sara Rosenbaum, a proponent of government-funded abortion.

75. No religious groups or other groups that oppose government-mandated coverage of contraception, sterilization, abortion, and related education and counseling were among the invited presenters.

76. One year after the first interim final rule was published, on July 19, 2011, the IOM published its recommendations. It recommended that the preventive services include "All Food and Drug Administration approved contraceptive methods [and] sterilization procedures." Institute of Medicine, *Clinical Preventive Services for Women: Closing the Gaps* (July 19, 2011).

77. FDA-approved contraceptive methods include birth-control pills; prescription contraceptive devices and injections; levonorgestrel, also known as the "morning-after pill" or "Plan B"; and ulipristal, also known as "Ella" or the "week-after pill"; and other drugs, devices, and procedures.

78. Thirteen days later, on August 1, 2011, HRSA issued guidelines adopting the IOM recommendations. http://www.hrsa.gov/womensguidelines. On the same day HHS, the Department of Labor, and the Department of Treasury promulgated an amended interim final

rule which reiterated the Mandate and added a narrow exemption for "religious employer[s]." 76 Fed. Reg. 46621 (published Aug. 3, 2011); 45 C.F.R. § 147.130.

79. HHS did not take into account the concerns of religious organizations in the comments submitted before the Mandate was issued.

80. Instead the Mandate was essentially unresponsive to the concerns stated in the comments submitted by religious organizations.

81. When it issued the Mandate, HHS requested comments from the public by September 30, 2011, and indicated that comments would be available online.

82. Upon information and belief, over 100,000 comments were submitted against the Mandate and its narrow "religious employer" exemption.

83. On October 5, 2011, six days after the comment period ended, Defendant Sebelius gave a speech at a fundraiser for NARAL Pro-Choice America. She told the assembled crowd that "we are in a war." She did not state whom she and NARAL Pro-Choice America were warring against.

84. The Mandate fails to take into account the statutory and constitutional conscience rights of religious organizations like Wheaton, even though those rights were repeatedly raised in the public comments.

85. The Mandate requires that Wheaton provide coverage or access to coverage for abortion and related education and counseling against its conscience in a manner that is contrary to law.

86. The Mandate constitutes government-imposed pressure and coercion on Wheaton to change or violate its religious beliefs.

87. The Mandate exposes Wheaton to substantial fines for refusal to change or violate its religious beliefs.

88. The Mandate imposes a burden on Wheaton's employee recruitment efforts by creating uncertainty as to whether Wheaton will be able to offer health insurance beyond 2012.

89. The Mandate places Wheaton at a competitive disadvantage in its efforts to recruit and retain employees.

90. The Mandate forces Wheaton to provide coverage or access to coverage for abortion-causing drugs, including Plan B and Ella, in violation of Wheaton's religious beliefs.

91. Wheaton has a sincere religious objection to providing coverage for Plan B and Ella since it believes those drugs could prevent a human embryo—which it understands to include a fertilized egg before it implants in the uterus—from implanting in the wall of the uterus, causing the death of the embryo.

92. Wheaton considers the prevention by artificial means of the implantation of a human embryo to be an abortion.

93. Wheaton believes that Plan B and Ella can cause the death of the embryo.

94. Plan B can prevent the implantation of a human embryo in the wall of the uterus.

95. The drug Ella can prevent the implantation of a human embryo in the wall of the uterus.

96. Plan B and Ella can cause the death of the embryo.

97. The use of artificial means to prevent the implantation of a human embryo in the wall of the uterus constitutes an "abortion" as that term is used in federal law.

98. The use of artificial means to cause the death of a human embryo constitutes an "abortion" as that term is used in federal law.

99. The Mandate forces Wheaton to provide insurance coverage or access to insurance coverage for abortion-causing drugs, including Plan B and Ella, regardless of the ability of insured persons to obtain these drugs from other sources.

100. The Mandate forces Wheaton to provide insurance coverage or access to insurance coverage for education and counseling concerning abortion that directly conflicts with Wheaton's religious beliefs and teachings.

101. Providing this counseling and education is incompatible and irreconcilable with Wheaton's express messages and speech.

102. The Mandate forces Wheaton to choose among violating its religious beliefs, incurring substantial fines, or terminating its employee health insurance coverage.

103. Group health plans and issuers will be subject to the Mandate starting with the first insurance plan year that begins on or after August 1, 2012.

104. Wheaton has already had to devote significant institutional resources, including both staff time and funds, to determining how to respond to the Mandate. Wheaton anticipates continuing to make such expenditures of time and money up until the time that the Mandate goes into effect.

## IV. The Narrow and Discretionary Religious Exemption

105. The Mandate indicates that that the Health Resources and Services Administration ("HRSA") "may" grant religious exemptions to certain religious employers. 45 C.F.R. § 147.130(a)(iv)(A).

106. The Mandate allows HRSA to grant exemptions for "religious employers" who "meet[ ] all of the following criteria: (1) The inculcation of religious values is the purpose of the

organization. (2) The organization primarily employs persons who share the religious tenets of the organization. (3) The organization serves primarily persons who share the religious tenets of the organization. (4) The organization is a nonprofit organization as described in section 6033(a)(1) and section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as amended." 45 C.F.R. § 147.130(a)(iv)(B).

107. The Mandate imposes no constraint on HRSA's discretion to grant exemptions to some, all, or none of the organizations meeting the Mandate's definition of "religious employers."

108. HHS stated that it based the exemption on comments on the 2010 interim final rule. 76 Fed. Reg. 46621.

109. Most religious organizations, including Wheaton, have more than one purpose.

110. For most religious organizations, including Wheaton, the inculcation of religious values is only one purpose among others.

111. On January 20, 2012, Defendant Sebelius announced that there would be no change to the "religious employer" exemption. Instead, she added that "[n]onprofit employers who, based on religious beliefs, do not currently provide contraceptive coverage in their insurance plan, will be provided an additional year, until August 1, 2013, to comply with the new law," on the condition that those employers certify they qualify for the extension. At the same time, however, Sebelius announced that HHS "intend[s] to require employers that do not offer coverage of contraceptive services to provide notice to employees, which will also state that contraceptive services are available at sites such as community health centers, public clinics, and hospitals with income-based support." *See* Statement by U.S. Dep't of Health and Human Services Secretary

Kathleen Sebelius, *available at* http://www.hhs.gov/news/press/2012pres/01/20120120a.html (last visited July 16, 2012).

112. On February 10, 2012, President Obama held a press conference at which he announced an intention to initiate, at some unspecified future date, a separate rulemaking process that would work toward creating a different insurer-based mandate. This promised mandate would, the President stated, attempt to take into account the kinds of religious objections voiced against the original Mandate contained in the interim final rule.

113. On that same day—February 10, 2012—the Defendants issued a "guidance bulletin" describing a "Temporary Enforcement Safe Harbor" ("Safe Harbor") from the Mandate. The Safe Harbor applies to "non-exempted, non-grandfathered group health plans established and maintained by non-profit organizations with religious objections to contraceptive coverage (and any health insurance coverage offered in connection with such plans)." Under the Safe Harbor, the Defendants state that qualifying organizations will not be subject to enforcement of the Mandate "until the first plan year that begins on or after August 1, 2013," provided they meet certain criteria outlined in the guidance bulletin.[3]

114. Those Safe Harbor criteria require an organization to self-certify that (1) it operates as a non-profit; (2) it has not, from February 10, 2012 onward, offered "contraceptive coverage . . .

---

[3]   *See* "Guidance on Temporary Enforcement Safe Harbor for Certain Employers, Group Health Plans and Group Health Insurance Issuers with Respect to the Requirement to Cover Contraceptive Services Without Cost Sharing Under Section 2713 of the Public Health Service Act, Section 715(a)(1) of the Employee Retirement Income Security Act, and Section 9815(a)(1) of the Internal Revenue Code," U.S. DEP'T OF HEALTH & HUMAN SERVS. (Feb. 10, 2012), at 3, *available at* http://cciio.cms.gov/resources/files/Files2/02102012/20120210-Preventive-Services-Bulletin.pdf   (last visited July 16, 2012).

by the group health plan established or maintained by the organization, consistent with any applicable State law, because of the religious beliefs of the organization"; and (3) it has provided (for the first plan year beginning on or after August 1, 2012) a notice to plan participants stating that "[t]he organization that sponsors your groups health plan has certified that it qualifies for a temporary enforcement safe harbor with respect to the Federal requirement to cover contraceptive services without cost sharing," and that "[d]uring this one-year period, coverage under your group health plan will not include coverage of contraceptive services."

115. On February 15, 2012, the Defendants adopted as final, "without change," the Mandate and its narrow "religious employers" exemption. 77 Fed. Reg. 8725, 8727.

116. On March 16, 2012, the Defendants issued an Advance Notice of Proposed Rulemaking ("ANPRM"). The ANPRM announced the Defendants' intention to create an "accommodation" for non-exempt religious organizations under which the Defendants would require a health insurance issuer (or third party administrator) to provide coverage for these drugs and services— without cost sharing and without charge—to employees covered under the organization's health plan. The ANPRM solicited public comments on structuring the proposed accommodation, and announced the Defendants' intention to finalize an accommodation by the end of the Safe Harbor period. *See* https://s3.amazonaws.com/public-inspection.federalregister.gov/2012-06689.pdf (published on March 21, 2012).

117. The ANPRM did not announce any intention to alter the Mandate or its narrow "religious employer" exemption, which was made "final, without change" on February 15, 2012.

118. In sum, the Mandate takes effect against Wheaton's employee insurance plans on January 1, 2013.

119. To qualify for the one-year non-enforcement period, Wheaton would be required to satisfy the Safe Harbor notice requirements outlined in the guidance bulletin by January 1, 2013.

120. Wheaton's employee insurance plans, however, are ineligible for the Safe Harbor, because they currently provide coverage for certain contraceptives and inadvertently provided coverage for a short period after February 10, 2012 for other now-excluded contraceptives, making it impossible for Wheaton to make the required Safe Harbor certification.

## CLAIMS

## COUNT I

### Violation of the Religious Freedom Restoration Act
### Substantial Burden

121.  Wheaton incorporates by reference all preceding paragraphs.

122.  Wheaton's sincerely held religious beliefs prohibit it from providing coverage or access to coverage for abortion or related education and counseling. Wheaton's compliance with these beliefs is a religious exercise.

123.  The Mandate creates government-imposed coercive pressure on Wheaton to change or violate its religious beliefs.

124.  The Mandate chills Wheaton's religious exercise.

125.  The Mandate exposes Wheaton to substantial fines for its religious exercise.

126.  The Mandate exposes Wheaton to substantial competitive disadvantages, in that it will no longer be permitted to offer health insurance.

127.  The Mandate imposes a substantial burden on Wheaton's religious exercise.

128.  The Mandate furthers no compelling governmental interest.

129.  The Mandate is not narrowly tailored to any compelling governmental interest.

130.  The Mandate is not the least restrictive means of furthering Defendants' stated interests.

131.  The Mandate and Defendants' threatened enforcement of the Mandate violate Wheaton's rights secured to it by the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq*.

132.  Absent injunctive and declaratory relief against the Mandate, Wheaton has been and will continue to be harmed.

<u>**COUNT II**</u>

**Violation of the First Amendment to the United States Constitution**
**Free Exercise Clause**
**Substantial Burden**

133.  Wheaton incorporates by reference all preceding paragraphs.

134.  Wheaton's sincerely held religious beliefs prohibit it from providing coverage or access to coverage for abortion or related education and counseling. Wheaton's compliance with these beliefs is a religious exercise.

135.  Neither the Affordable Care Act nor the Mandate is neutral.

136.  Neither the Affordable Care Act nor the Mandate is generally applicable.

137.  Defendants have created categorical exemptions and individualized exemptions to the Mandate.

138.  The Mandate furthers no compelling governmental interest.

139.  The Mandate is not the least restrictive means of furthering Defendants' stated interests.

140.  The Mandate creates government-imposed coercive pressure on Wheaton to change or violate its religious beliefs.

141.  The Mandate chills Wheaton's religious exercise.

142.  The Mandate exposes Wheaton to substantial fines for its religious exercise.

143.  The Mandate exposes Wheaton to substantial competitive disadvantages, in that it will no longer be permitted to offer health insurance.

144.  The Mandate imposes a substantial burden on Wheaton's religious exercise.

145.  The Mandate is not narrowly tailored to any compelling governmental interest.

146.  The Mandate and Defendants' threatened enforcement of the Mandate violate Wheaton's rights secured to it by the Free Exercise Clause of the First Amendment of the United States Constitution.

147.  Absent injunctive and declaratory relief against the Mandate, Wheaton has been and will continue to be harmed.

## COUNT III

**Violation of the First Amendment to the United States Constitution**
**Free Exercise Clause**
**Intentional Discrimination**

148.  Wheaton incorporates by reference all preceding paragraphs.

149.  Wheaton's sincerely held religious beliefs prohibit it from providing coverage or access to coverage for abortion or related education and counseling. Wheaton's compliance with these beliefs is a religious exercise.

150.  Despite being informed in detail of these beliefs beforehand, Defendants designed the Mandate and the religious exemption to the Mandate in a way that made it impossible for Wheaton to comply with both its religious beliefs and the Mandate.

151.  Defendants promulgated both the Mandate and the religious exemption to the Mandate in order to suppress the religious exercise of Wheaton and others.

152. The Mandate and Defendants' threatened enforcement of the Mandate thus violate the Wheaton's rights secured to it by the Free Exercise Clause of the First Amendment of the United States Constitution.

153. Absent injunctive and declaratory relief against the Mandate, Wheaton has been and will continue to be harmed.

## COUNT IV

### Violation of the First Amendment to the United States Constitution
### Free Exercise Clause
### Discrimination Among Religions

154. Wheaton incorporates by reference all preceding paragraphs.

155. By design, Defendants imposed the Mandate on some religious organizations but not on others, resulting in discrimination among religions.

156. The Mandate vests HRSA with unbridled discretion in deciding whether to allow exemptions to some, all, or no organizations meeting the definition of "religious employers."

157. The Mandate and Defendants' threatened enforcement of the Mandate thus violate Wheaton's rights secured to it by the Free Exercise Clause of the First Amendment of the United States Constitution.

158. Absent injunctive and declaratory relief against the Mandate, Wheaton has been and will continue to be harmed.

## COUNT V

### Violation of the First Amendment to the United States Constitution
### Establishment Clause
### Selective Burden/Denominational Preference (*Larson* v. *Valente*)

159. Wheaton incorporates by reference all preceding paragraphs.

160.  By design, defendants imposed the Mandate on some religious organizations but not on others, resulting in a selective burden on Wheaton.

161.  The Mandate vests HRSA with unbridled discretion in deciding whether to allow exemptions to some, all, or no organizations meeting the definition of "religious employers."

162.  The Mandate and Defendants' threatened enforcement of the Mandate therefore violate Wheaton's rights secured to it by the Establishment Clause of the First Amendment of the United States Constitution.

163.  Absent injunctive and declaratory relief against the Mandate, Wheaton has been and will continue to be harmed.

<u>**COUNT VI**</u>

**Violation of the First Amendment to the United States Constitution
Free Exercise and Establishment Clauses
Excessive Entanglement**

164.  Wheaton incorporates by reference all preceding paragraphs.

165.  The Free Exercise Clause and the Establishment Clause of the First Amendment prohibit intrusive government inquiries into the religious beliefs of individuals and institutions, and other forms of excessive entanglement between religion and government.

166.  This prohibition on excessive entanglement protects organizations as well as individuals.

167.  In order to qualify for the "religious employers" exemption to the Mandate, entities must submit to an invasive government investigation into an organization's religious beliefs, including whether the organization's "purpose" is the "inculcation of religious values" and

whether the organization "primarily employs" and "primarily serves" individuals who share the organization's religious tenets.

168.  It is unclear how the government will determine whether an organization meets the Mandate's definition of a sufficiently "religious" organization, leading to the government's unbridled discretion to determine whether to exempt an organization.

169.  The Mandate thus requires the government to engage in invasive inquiries and judgments regarding questions of religious belief or practice.

170.  The Mandate results in an excessive entanglement between religion and government.

171.  The Mandate is therefore unconstitutional and invalid.

172.  The enactment and impending enforcement of the Mandate violates the Free Exercise Clause and the Establishment Clause of the First Amendment.

173.  Absent injunctive and declaratory relief against the Mandate, Wheaton has been and will continue to be harmed.

<u>**COUNT VII**</u>

**Violation of the First Amendment to the United States Constitution**
**Free Exercise and Establishment Clauses**
**Excessive Interference in Matters of Internal Governance**

174.  Wheaton incorporates by reference all preceding paragraphs.

175.  The Free Exercise Clause and Establishment Clause protect the freedom of religious organizations to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.

176.  Under these Clauses, the government may not interfere with a religious organization's internal decisions concerning the organization's religious structure, ministers, or doctrine.

177.  Under these Clauses, the government may not interfere with a religious organization's internal decision if that interference would affect the faith and mission of the organization itself.

178.  Wheaton is a religious organization.

179.  It is a violation of Wheaton's religious beliefs to deliberately provide insurance coverage for drugs, devices, services, or procedures inconsistent with its faith, in particular abortion-inducing drugs, abortion procedures, and related services.  Likewise, it is a violation of Wheaton's religious beliefs to provide health insurance for such drugs, procedures, or services even if those items were paid for by an insurer or a plan administrator and not by Wheaton.

180.  The government may not interfere with Wheaton's religious beliefs on abortion-inducing drugs, abortion procedures, and related services.

181.  The Mandate interferes with Wheaton's internal decisions by requiring it either to facilitate practices that directly conflict with its religious beliefs or face substantial penalties.

182.  The Mandate and its religious employer exemption interfere with the organizational structure of Wheaton by requiring Wheaton to include or facilitate coverage for practices that directly conflict with its religious beliefs but purporting to exempt churches.

183.  Because the Mandate interferes with the internal decisionmaking and organizational structure of Wheaton in a manner that affects its faith and mission, the Mandate violates the Establishment Clause and the Free Exercise Clause of the First Amendment.

<u>**COUNT VIII**</u>

**Violation of the First Amendment to the United States Constitution**
**Freedom of Speech**
**Compelled Speech**

184.   Wheaton incorporates by reference all preceding paragraphs.

185.   Wheaton teaches that abortion violates its religious beliefs.

186.   The Mandate would compel Wheaton to cooperate in activities through its provision of health insurance that Wheaton teaches are violations of Wheaton's religious beliefs.

187.   The Mandate would compel Wheaton to provide education and counseling related to abortion.

188.   Defendants' actions thus violate Wheaton's right to be free from compelled speech as secured to it by the First Amendment of the United States Constitution.

189.   The Mandate's compelled speech requirement is not narrowly tailored to a compelling governmental interest.

190.   Absent injunctive and declaratory relief against the Mandate, Wheaton has been and will continue to be harmed.

<u>**COUNT IX**</u>

**Violation of the First Amendment to the United States Constitution**
**Freedom of Speech**
**Expressive Association**

191.   Wheaton incorporates by reference all preceding paragraphs.

192.   Wheaton teaches that abortion violates its religious beliefs.

193.   The Mandate would compel Wheaton to cooperate in activities through its provision of health insurance that Wheaton teach are violations of Wheaton's religious beliefs.

194. The Mandate would compel Wheaton to provide, through its provision of health insurance, education and counseling related to abortion.

195. Defendants' actions thus violate Wheaton's right of expressive association as secured to it by the First Amendment of the United States Constitution.

196. Absent injunctive and declaratory relief against the Mandate, Wheaton has been and will continue to be harmed.

## COUNT X

**Violation of the First Amendment to the United States Constitution
Free Exercise Clause and Freedom of Speech
Unbridled Discretion**

197. Wheaton incorporates by reference all preceding paragraphs.

198. By stating that HRSA "may" grant an exemption to certain religious groups, the Mandate vests HRSA with unbridled discretion over which organizations can have its First Amendment interests accommodated.

199. The Mandate vests HRSA with unbridled discretion to determine whether a religious organization such as Wheaton "primarily" serves and employs members of the same faith as the organization.

200. Defendants' actions therefore violate Wheaton's right not to be subjected to a system of unbridled discretion when engaging in speech or when engaging in religious exercise, as secured to it by the First Amendment of the United States Constitution.

201. Absent injunctive and declaratory relief against the Mandate, Wheaton has been and will continue to be harmed.

## COUNT XI

### Violation of the Administrative Procedure Act
### Lack of Good Cause

202.  Wheaton incorporates by reference all preceding paragraphs.

203.  Defendants' stated reasons that public comments were unnecessary, impractical, and opposed to the public interest are false and insufficient, and do not constitute "good cause."

204.  Without proper notice and opportunity for public comment, Defendants were unable to take into account the full implications of the regulations by completing a meaningful "consideration of the relevant matter presented." Defendants did not consider or respond to the voluminous comments they received in opposition to the interim final rule.

205.  Therefore, Defendants have taken agency action not in observance with procedures required by law, and Wheaton are entitled to relief pursuant to 5 U.S.C. § 706(2)(D).

206.  Absent injunctive and declaratory relief against the Mandate, Wheaton has been and will continue to be harmed.

## COUNT XII

### Violation of the Administrative Procedure Act
### Arbitrary and Capricious Action

207.  Wheaton incorporates by reference all preceding paragraphs.

208.  In promulgating the Mandate, Defendants failed to consider the constitutional and statutory implications of the mandate on Wheaton and similar organizations.

209.  Defendants' explanation for its decision not to exempt Wheaton and similar religious organizations from the Mandate runs counter to the evidence submitted by religious organizations during the comment period.

210.  Thus, Defendants' issuance of the interim final rule was arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A) because the rules fail to consider the full extent of its implications and they do not take into consideration the evidence against them.

211.  Absent injunctive and declaratory relief against the Mandate, Wheaton has been and will continue to be harmed.

### COUNT XIII

**Violation of the Administrative Procedure Act**
**Agency Action Not in Accordance with Law**
**Weldon Amendment**
**Religious Freedom Restoration Act**
**First Amendment to the United States Constitution**

212.  Wheaton incorporates by reference all preceding paragraphs.

213.  The Mandate is contrary to the provisions of the Weldon Amendment of the Consolidated Security, Disaster Assistance, and Continuing Appropriations Act of 2009, Public Law 110 329, Div. A, Sec. 101, 122 Stat. 3574, 3575 (Sept. 30, 2008).

214.  The Weldon Amendment provides that "[n]one of the funds made available in this Act [making appropriations for Defendants Department of Labor and Health and Human Services] may be made available to a Federal agency or program . . . if such agency, program, or government subjects any institutional or individual health care entity to discrimination on the basis that the health care entity does not provide, pay for, provide coverage of, or refer for abortions."

215.  The Mandate requires issuers, including Wheaton, to provide coverage or access to coverage of all FDA-approved "contraceptives."

216.  Some FDA-approved "contraceptives" cause abortions.

217.  As set forth above, the Mandate violates RFRA and the First Amendment.

218.  Under 5 U.S.C. § 706(2)(A), the Mandate is contrary to existing law, and is in violation of the APA.

219.  Absent injunctive and declaratory relief against the Mandate, Wheaton has been and will continue to be harmed.

### COUNT XIV

**Violation of the Administrative Procedure Act**
**Agency Action Not in Accordance with Law**
**Affordable Care Act**

220.  Wheaton incorporates by reference all preceding paragraphs.

221.  The Mandate is contrary to the provisions of the Affordable Care Act.

222.  Section 1303(b)(1)(A) of the Affordable Care Act states that "nothing in this title"—*i.e.*, title I of the Act, which includes the provision dealing with "preventive services"—"shall be construed to require a qualified health plan to provide coverage of [abortion] services . . . as part of its essential health benefits for any plan year."

223.  Section 1303 further states that it is "the issuer" of a plan that "shall determine whether or not the plan provides coverage" of abortion services.

224.  Under the Affordable Care Act, Defendants do not have the authority to decide whether a plan covers abortion; only the issuer does.

225.  The Mandate requires issuers, including Wheaton, to provide coverage or access to coverage for all Federal Drug Administration-approved contraceptives.

226.  Some FDA-approved contraceptives cause abortions.

227.  Under 5 U.S.C. § 706(2)(A), the Mandate is contrary to existing law, and is in violation of the APA.

228.  Absent injunctive and declaratory relief against the Mandate, Wheaton has been and will continue to be harmed.

## PRAYER FOR RELIEF

Wherefore, Wheaton requests that the Court:

a.  Declare that the Mandate and Defendants' enforcement of the Mandate against Wheaton violate the First Amendment of the United States Constitution;

b.  Declare that the Mandate and Defendants' enforcement of the Mandate against Wheaton violate the Religious Freedom Restoration Act;

c.  Declare that the Mandate was issued in violation of the Administrative Procedure Act;

d.  Issue an order prohibiting Defendants from enforcing the Mandate against Wheaton and other organizations that object on religious grounds to providing insurance coverage for contraceptives (including abortifacient contraceptives), sterilization procedures, and related education and counseling;

e.  Award Wheaton the costs of this action and reasonable attorney's fees; and

f.  Award such other and further relief as it deems equitable and just.

Respectfully submitted this 18th day of July, 2012.

## JURY DEMAND

Wheaton requests a trial by jury on all issues so triable.

_____s/ *Eric N. Kniffin*_____
Eric N. Kniffin (DC Bar No. 999473)
S. Kyle Duncan (LA Bar No. 25038)
 (*pro hac vice* application to be filed)
Mark Rienzi (DC Bar No. 494336)
Lori Halstead Windham (DC Bar No. 501838)
The Becket Fund for Religious Liberty
3000 K St. NW
Suite 220
Washington, DC 20007
(202) 955-0095
(202) 955-0090
ekniffin@becketfund.org

*Counsel for Plaintiff*