**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **WHEATON COLLEGE,**<br><br>***Plaintiff,***<br><br>**v.**<br><br>**KATHLEEN SEBELIUS, *et al.*,**<br><br>***Defendants.*** | **Civil Action No. 12-1169 (ESH)** |

**MEMORANUM OPINION**

Wheaton College, a Christian liberal arts college located in Wheaton, Illinois, has sued, claiming that regulations defendants issued pursuant to the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (March 23, 2010), violates the First Amendment, the Administrative Procedure Act, and the Religious Freedom Restoration Act. (Complaint, July 18, 2012 [Dkt. No. 1] ("Compl.") ¶¶ 1–2, 6–8.) The regulations require covered employers to offer group health insurance plans that provide women with certain forms of preventive care, including all FDA-approved forms of contraception, without cost sharing. Wheaton argues that it cannot offer health plans that cover emergency contraceptives, namely Plan B (levonorgestrel, or the "morning-after pill") and Ella (ulipristal, or the "week-after pill"), consistent with its religious beliefs.

Wheaton moved for a preliminary injunction on August 1, 2012. (Motion for Preliminary Injunction, August 1, 2012 [Dkt. No. 4] ("Pl. Mot.").) On August 10, defendants moved to dismiss pursuant to Fed. R. Civ. P. 12(b)(1), arguing that Wheaton lacks standing and that its claims are not ripe. (Defendants' Motion to Dismiss, August 10, 2012 [Dkt. No. 17]

(“Def. Mot.”).) Wheaton opposed defendants’ motion (August 16, 2012 [Dkt. No. 18] (“Pl. Opp’n”)), defendants filed a reply in further support thereof (August 20, 2012 [Dkt. No. 19] (“Def. Reply”)), and the Court heard oral argument. (8/23 Tr.) Based on this record, the Court concludes that, in light of concrete steps defendants are taking to address Wheaton’s concerns, including their commitment not to enforce the challenged regulations against Wheaton while accommodations are being negotiated, Wheaton has not alleged a concrete and imminent injury and that its claims are not fit for judicial review. For the reasons stated, the Court will grant defendants’ motion to dismiss.

**BACKGROUND**

This action is one of twenty-six lawsuits challenging the Affordable Care Act’s preventive services regulations with regard to their requirements involving contraception.[1] In recent decisions granting the federal defendants’ motion to dismiss on standing and ripeness grounds in two of these cases, Judges Urbom and Boasberg described the relevant statutory and regulatory background in detail. *See Nebraska ex rel. Bruning v. U.S. Dep’t of Health & Human Servs.*, --- F. Supp. 2d ----, 2012 WL 2913402, at *2–5 (D. Neb. 2012) (Urbom, J.); *Belmont Abbey College v. Sebelius*, --- F. Supp. 2d ----, 2012 WL 2914417, at *1–3 (D.D.C. 2012) (Boasberg, J.). In summary, the Affordable Care Act (“ACA”) “requires group health plans to provide women with ‘preventive care and screenings’ at no charge to the patient.” *Id.* at *1 (quoting 42 U.S.C. § 300gg-13(a)(4)). While certain health plans are grandfathered,[2] the rest must, “with respect to women,” cover “such additional preventive care and screenings . . . as

---

[1] *See* The Becket Fund for Religious Liberty – HHS Mandate Information Central, http://www.becketfund.org/hhsinformationcentral/ (last visited August 24, 2012).

[2] Wheaton alleges that its plans are not grandfathered (Compl. ¶ 44) and defendants do not dispute this assertion.

provided for in comprehensive guidelines supported by the Health Resources and Services Administration" ("HRSA") without imposing any cost sharing requirements. *Id.* § 300gg-13(a)(4).

The guidelines subsequently adopted by HRSA require insurance plans to cover, *inter alia*, all "contraceptive methods," including Plan B and Ella, "sterilization procedures, and patient education and counseling for all women with reproductive capacity" that are approved by the FDA. Women's Preventive Services: Required Health Plan Coverage Guidelines, http://www.hrsa.gov/womensguidelines/ (last visited August 24, 2012); *see Belmont Abbey College*, 2012 WL 2914417, at *1–2 (citing FDA Birth Control Guide, http://www.fda.gov/forconsumers/byaudience/forwomen/ucm118465.htm (last visited August 24, 2012)). Defendants promulgated an interim final rule, effective August 1, 2011, "requiring 'group health plan[s] and . . . health insurance issuer[s] offering group or individual insurance coverage [to] provide benefits for and prohibit the imposition of cost sharing with respect to' the preventive services for women included in HRSA's guidelines." *Id.* at *2 (alterations in the original) (quoting Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the ACA, 76 Fed. Reg. 46,621, 46,622–23 (August 3, 2011) (interim final rules with request for comments); citing 45 C.F.R. § 147.130).

Responding to comments received about a prior interim rule, defendants acknowledged "the effect on the religious beliefs of certain religious employers if coverage of contraceptive services were required," and granted HRSA the authority "to exempt certain religious employers from [its] Guidelines where contraceptive services are concerned." 76 Fed. Reg. at 46,623. The interim final rule provided a definition for "religious employers" that included houses of worship

but did not include institutions like Wheaton College.[3] (*See* Compl. ¶¶ 105–110; Def. Mot. at 7–8.)

Defendants requested comments on the interim final rule and specifically on its definition of "religious employer." 76 Fed. Reg. at 46,623. In response to the more than 200,000 comments defendants received, defendants published final regulations adopting the definition of "religious employer" in the interim final rule and simultaneously establishing a temporary enforcement safe harbor for non-profit employers that did not meet that definition's criteria but that professed religious objections to providing coverage for contraceptives. Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the ACA, 77 Fed. Reg. 8,725, 8,725–8,729 (February 15, 2012) (final rules). Defendants stated that "[b]efore the end of the temporary enforcement safe harbor," they would "work with stakeholders to develop alternative ways of providing contraceptive coverage without cost sharing with respect to non-exempted, non-profit religious organizations with religious objections to such coverage." *Id.* at 8,728.

Defendants have announced that, during the temporary enforcement safe harbor, the government will not take any enforcement action against any employer, group health plan, or group health insurance issuer with respect to a non-grandfathered plan that fails to cover some or all recommended contraceptive services and that is sponsored by an organization that meets the following criteria:

1. The organization is organized and operates as a non-profit entity.

[3] The interim final rule defined "a religious employer [as] one that: (1) Has the inculcation of religious values as its purpose; (2) primarily employs persons who share its religious tenets; (3) primarily serves persons who share its religious tenets; and (4) is a non-profit organization under" the Internal Revenue Code." 76 Fed. Reg. at 46,623.

> 2. From February 10, 2012 onward, contraceptive coverage has not been provided at any point by the group health plan established or maintained by the organization, consistent with any applicable [s]tate law, because of the religious beliefs of the organization.
>
> 3. . . . [T]he group health plan established or maintained by the organization (or another entity on behalf of the plan, such as a health insurance issuer or third-party administrator) must provide [notice] to participants . . . stat[ing] that contraceptive coverage will not be provided under the plan for the first plan year beginning on or after August 1, 2012.
>
> 4. The organization self-certifies that it satisfies criteria 1–3 above . . . .

HHS, Guidance on the Temporary Enforcement Safe Harbor, February 10, 2012 ("Feb. 2012 Guidance") at 3 (footnote omitted), *available at* http://cciio.cms.gov/resources/files/Files2/02102012/20120210-Preventive-Services-Bulletin.pdf. In a revised guidance, defendants "clarif[ied] . . .

> (1) that the safe harbor is also available to non-profit organizations with religious objections to some but not all contraceptive coverage . . .; (2) that group health plans that took some action to try to exclude or limit contraceptive coverage that was not successful as of February 10, 2012, are not for that reason precluded from eligibility for the safe harbor . . .; and (3) that the safe harbor may be invoked without prejudice by non-profit organizations that are uncertain whether they qualify for the religious employer exemption . . . .

HHS, Guidance on the Temporary Enforcement Safe Harbor, August 15, 2012 ("Aug. 2012 Guidance") at 1 n.1, *available at* http://cciio.cms.gov/resources/files/prev-services-guidance-08152012.pdf; *see id.* at 3–4 (stating revised criteria for the temporary enforcement safe harbor in accordance with the above).[4]

[4] Defendants issued the August 2012 Guidance in response to this lawsuit. In its complaint, Wheaton alleged that it was not eligible for the temporary enforcement safe harbor as described in the February 2012 Guidance because "Wheaton's employee insurance plans . . . currently provide coverage for certain contraceptives and inadvertently provided coverage for a short period after February 10, 2012 for other now-excluded contraceptives," such as Plan B and Ella. (Compl. ¶ 120; *see also* Pl. Mot. at 7–9.) In their motion to dismiss, defendants announced an interpretation of the safe harbor criteria encompasses Wheaton, and this interpretation has now

The "safe harbor provides an additional year for these group health plans and group health insurance issuers (i.e., until the first plan year beginning on or after August 1, 2013)" to comply with HRSA guidelines regarding contraceptive coverage. *Id.* at 3. It also provides time for defendants, as they announced in a March 2012 Advanced Notice of Proposed Rulemaking ("ANPRM"), "to expeditiously develop and propose changes to the final regulations" regarding preventive services "that would meet two goals—accommodating non-exempt, non-profit religious organizations' religious objections to covering contraceptive services and assuring that participants and beneficiaries covered under such organizations' plans receive contraceptive coverage without cost sharing." Certain Preventive Services Under the ACA, 77 Fed. Reg. 16,501, 16,503 (March 21, 2012). In the ANPRM, defendants thus "formally declar[ed] their intention to amend the final regulations" with regard to contraceptive coverage "and solicit[ed] input from interested parties and the public." *Belmont Abbey College*, 2012 WL 2914417, at *3. Defendants represent that, having received comments on the ANPRM, they "will publish a notice of proposed rulemaking, which will be subject to further public comment, before [they] issue further amendments to the preventive services coverage regulations"; defendants will "finalize the amendments . . . such that they are effective before the end of the temporary enforcement safe harbor." (Def. Mot. at 10 (citing 77 Fed. Reg. at 16,501, 16,503, 16,508).)

Wheaton College brought suit, claiming that the regulations as currently fashioned violate the Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb *et seq.* (Counts I, XIII), the First Amendment (Counts II–X, XIII), and the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.* (Counts XI–XIV).

---

been formalized in the August 2012 Guidance. (Def. Mot. at 9.)

## ANALYSIS

Defendants have moved to dismiss on standing and ripeness grounds. Because defendants' claims go to the Court's jurisdiction, the Court must consider them before addressing Wheaton's motion for a preliminary injunction. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998). Wheaton bears the burden of establishing that this Court has jurisdiction over its claims. *Id.* at 104.

### I. STANDING

> [T]o establish constitutional standing, plaintiffs must satisfy three elements: (1) they must have suffered an injury in fact that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical"; (2) the injury must be "fairly traceable to the challenged action of the defendant"; and (3) "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."

*NB ex rel. Peacock v. Dist. of Columbia*, 682 F.3d 77, 81 (D.C. Cir. 2012) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).

At issue here is whether Wheaton College has alleged an injury in fact. In *Whitmore v. Arkansas*, 495 U.S. 149 (1990), "the Supreme Court summarized its case law and flatly stated: '[W]e have said many times before and reiterate today: *Allegations of possible future injury do not satisfy the requirements of Art[icle] III.* A threatened injury must be certainly impending to constitute injury in fact.'" *Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1294 (D.C. Cir. 2007) (alterations in the original) (quoting *Whitmore*, 495 U.S. at 158 (collecting cases)).

Wheaton concedes that it does not face an impending government enforcement action. It is undisputed, given the August 2012 Guidance, that Wheaton qualifies for the temporary enforcement safe harbor. (Def. Mot. at 12 (citing the declaration of HHS official Michael Hash

¶ 5); Pl. Opp'n at 10.) Furthermore, Wheaton has indicated that it will self-certify its eligibility and take advantage of the safe harbor pursuant to the August 2012 Guidance's requirements.[5] Accordingly, the government "will not take any enforcement action against [Wheaton College] until the first plan year that begins on or after August 1, 2013." (Def. Mot. at 12 (citing Aug. 2012 Guidance at 3).) Wheaton College may therefore continue to offer its current health plans, which do not cover Plan B and Ella, for the upcoming plan year without fear of government interference.[6]

[5] The upcoming plan year for Wheaton's employee insurance plans will begin on January 1, 2013. (Compl. ¶ 43.) In opposing defendants' motion to dismiss, Wheaton stated that "as of that date, Wheaton's health insurance will be in violation of federal law. . . . Wheaton will now be relieved from government enforcement of the [preventive services regulations] for an extra year, [but] it will still violate federal law" as of January 1. (Pl. Opp'n at 11.) With good reason, the Court and defendants (*see* Def. Reply at 2) read this as a statement by Wheaton that it would continue its current plans, which do not cover Plan B and Ella, for the upcoming year. However, Wheaton's lawyer backpedaled at oral argument and asserted that his client has yet to make a final decision about whether it would continue its current coverage or begin offering health plans that include emergency contraceptives. (8/23 Tr. at 33.)

[6] At oral argument, counsel for Wheaton claimed that the August 2012 Guidance, which makes Wheaton eligible for the temporary enforcement safe harbor, is irrelevant to the standing analysis because "the standing inquiry [is] focused on whether the party invoking jurisdiction had the requisite stake in the outcome *when the suit was filed*," *Davis v. FEC*, 554 U.S. 724, 734 (2008) (emphasis added), and when Wheaton filed its complaint it alleged that, under the criteria announced in the February 2012 Guidance that were operative at the time, it was not eligible. (Compl. ¶ 120; *see* 8/23 Tr. at 3–4.) However, the requirement that a plaintiff establish standing "continue[s] throughout the course of the litigation," *Johnson v. Holway*, No. 03-cv-2513 (ESH), 2005 WL 3307296, at *25 (D.D.C. Dec. 6, 2005), because "'[i]f the plaintiff loses standing . . . during the pendency of the proceedings . . ., the matter becomes moot, and the court loses jurisdiction.'" *McNair v. Synapse Grp. Inc.*, 672 F.3d 213, 227 n.17 (3d Cir. 2012) (some alterations in the original) (quoting *Altman v. Bedford Cent. Sch. Dist.*, 245 F.3d 49, 69 (2d Cir. 2001)). Indeed, the standing "requirement subsists through all stages of federal judicial proceedings," and "it is not enough that a dispute was very much alive when suit was filed" because "[t]he parties must continue to have a 'personal stake in the outcome' of the lawsuit." *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990) (citations and some internal quotation marks omitted) (quoting *Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983)). In sum, "Standing represents a jurisdictional requirement which remains open to review at all stages of the litigation." *Nat'l Org. for Women v. Scheidler*, 510 U.S. 249, 255 (1994).

Wheaton protests that it still alleges a "'*certainly* impending'" injury, *Lujan*, 504 U.S. at 564 n.2 (some internal quotation marks omitted) (quoting *Whitmore*, 495 U.S. at 158), because it *may* be subject to ERISA lawsuits attempting enforcement of the preventive services regulations. (Pl. Opp'n at 11.) However, even crediting Wheaton's assertion that it is "completely exposed" to such actions (*id.* (citing 29 U.S.C. §§ 1132(a), 1185d(a)(1))), it is well-established that the theoretical possibility of harm from future litigation does not, without more, confer standing. "'Allegations of injury based on predictions regarding future legal proceedings are . . . too speculative to invoke the jurisdiction of an Article III Court.'" *City of Orrville v. FERC*, 147 F.3d 979, 987 (D.C. Cir. 1998) (alteration in the original) (quoting *Platte River Whooping Crane Critical Habitat Maint. Trust v. FERC*, 962 F.2d 27, 35 (D.C. Cir. 1992) (citing *Whitmore*, 495 U.S. at 157)); *see also Salvation Army v. Dep't of Cmty. Affairs of New Jersey*, 919 F.2d 183, 193 (3d Cir. 1990) (concluding that "the theoretical possibility of a suit against [plaintiff] by a program beneficiary" was not sufficient to establish jurisdiction); *Belmont Abbey College*, 2012 WL 2914417, at *15 (rejecting an argument identical to that raised by Wheaton College (citing *Salvation Army*, 919 F.2d at 193)).

Furthermore, Wheaton has not demonstrated that there is anything "actual or imminent," *Whitmore*, 495 U.S. at 155, about the specter of a "participant [in] or beneficiary of" one of Wheaton's health plans suing under ERISA, 29 U.S.C. § 1132(a), to challenge the fact that the

---

Furthermore, although the burden lies with the party *asserting* mootness, *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000), the fact that a case *becomes* moot when plaintiff loses standing, *McNair*, 672 F.3d at 227 n.17, does not mean that it is somehow defendant's burden to show that plaintiff no longer faces imminent injury. To the contrary, "[t]he party asserting federal jurisdiction bears the burden of establishing [that it has standing] at every stage of the litigation, as it does for 'any other essential element of the case.'" *Krottner v. Starbucks Corp.*, 628 F.3d 1139, 1141 (9th Cir. 2010) (quoting *Cent. Delta Water Agency v. United States*, 306 F.3d 938, 947 (9th Cir. 2002)).

plan does not cover Plan B or Ella. To the contrary, the allegations in Wheaton's complaint support the conclusion that this is a "'conjectural' or 'hypothetical'" possibility. *Whitmore*, 495 U.S. at 155 (quoting *Lyons*, 461 U.S. at 101–02). (*See* Compl. ¶¶ 20–29, 37–38.) "Each year, all Wheaton College students and full-time employees commit themselves to" the "Christian community of living, learning, and serving that Wheaton College aspires to be . . . by signing Wheaton College's Community Covenant." (*Id.* ¶¶ 25–26.) That Covenant "recognizes that Scripture condemns the taking of innocent life." (*Id.* ¶ 28.) Wheaton alleges that it "believes and teaches that abortion ends a human life and is a sin" (*id.* ¶ 29); that its "religious beliefs prohibit it from deliberately providing insurance coverage for drugs, procedures, or services inconsistent with its faith, in particular abortion-inducing drugs" (*id.* ¶ 37); and that these include, in Wheaton's view, Plan B and Ella. (*Id.* ¶ 90.) Therefore, the possibility that Wheaton College health plan participants, all of whom have signed the Community Covenant, or beneficiaries, who are likely family members of Wheaton employees, would sue Wheaton to secure free access to Plan B and Ella is remote at best.[7] It is therefore reasonable to conclude that such private suits are not "certainly impending." *Whitmore*, 495 U.S. at 158.

---

[7] Wheaton provides health insurance for its 709 full-time employees. (Compl. ¶ 35; Pl. Opp'n at 1.) At oral argument, counsel for Wheaton affirmed the complaint's allegation that all of Wheaton's full-time employees, and therefore all of its health plans' participants, have signed the Community Covenant. (8/23 Tr. at 7.) The Court recognizes that Wheaton also provides health insurance for its employees' family members (Pl. Mot. at 7), who may not necessarily share the views described in Wheaton's complaint. Nonetheless, counsel for Wheaton admitted that he did not know if anyone had ever asked Wheaton to cover Plan B or Ella, and that he had no concrete evidence to support his claim that a private ERISA suit is a realistic threat. (8/23 Tr. at 9–10; *id.* at 32 ("[W]hether the actual lawsuit happens next year is at some level speculative . . . . We don't have a crystal ball and we don't know . . . .").) *See Salvation Army*, 919 F.2d at 193 ("Nothing in the current record indicates that [plaintiff] has been threatened with suit . . . or provides any other reason to believe that [plaintiff's] professed fear of a . . . suit is a realistic one.").

In arguing to the contrary, Wheaton relies heavily, if not exclusively, on *Chamber of Commerce v. FEC*, 69 F.3d 600 (D.C. Cir. 1995). Wheaton's reliance is misplaced. In *Chamber of Commerce*, the Circuit's conclusion that plaintiffs had standing to challenge a Federal Election Commission regulation on political speech was premised on its belief that a government enforcement action, even if not imminent, was nonetheless likely. While the *Chamber of Commerce* plaintiffs were "not faced with any present danger of an enforcement proceeding" because the Commission could not act while it was tenuously "split three-three," the Circuit held that plaintiffs had standing because "[n]othing" would "prevent[] the Commission from enforcing its rule at any time with, perhaps, another change of mind of one of the Commissioners." 69 F.3d at 603; *see id.* at 603–04 ("A party has standing to challenge, pre-enforcement, even the constitutionality of a *statute* if First Amendment rights are arguably chilled, so long as there is a credible threat of [government] prosecution." (citing, *inter alia*, *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392–93 (1988) (finding plaintiffs had standing to bring a pre-enforcement First Amendment challenge because "[t]he [s]tate has not suggested that the newly enacted law will not be enforced" and "plaintiffs have alleged an actual and well-founded fear that the law will be enforced against them"))).

Here, however, the government's commitment not to act against employers that qualify for the temporary enforcement safe harbor was the product of sustained agency and public deliberation, *see* 77 Fed. Reg. at 8,726–27, and it represents a final decision, *see* 77 Fed. Reg. at 16,502–03, that has been reiterated twice. *See* Feb. 2012 Guidance; Aug. 2012 Guidance. Wheaton has not even argued that the Court should question the government's promise not to enforce the preventive services regulations against it while defendants work with Wheaton and others to revise them. This alone serves to distinguish *Chamber of Commerce*, where there was

no formal commitment not to prosecute and an enforcement action was likely enough that even counsel for the government "agreed at oral argument—as he really had to—that he would not advise [plaintiffs] to ignore the rule" that they were challenging. 69 F.3d at 603.

Moreover, the *Chamber of Commerce* plaintiffs alleged that in the prior election cycle they responded to the issuance of the FEC regulation by ceasing the political activity that the regulation affected. *Id.* at 602, 603. They thus substantiated their allegations regarding the chilling effect of the challenged regulation on their constitutionally protected speech by putting forward a credible "'claim of specific present objective harm.'" *Bigelow v. Virginia*, 421 U.S. 809, 816–17 (1975) (quoting *Laird v. Tatum*, 408 U.S. 1, 14 (1972)).

Therefore, the fact that the Circuit in *Chamber of Commerce* also cited plaintiffs' First Amendment claims and the potential that plaintiffs would be "subject to [private] litigation challenging the legality of their actions," 69 F.3d at 603–04, provides scant support for Wheaton's arguments. Wheaton is unquestionably exempt from government enforcement actions during the safe harbor and it has indicated, in opposing defendants' motion to dismiss, that it will not compromise its beliefs in response to the preventive services regulations during that period. (Pl. Opp'n at 10–11.) As noted above (*see supra* n.5), Wheaton's counsel retreated from this unequivocal statement of its future plans at oral argument, and described the "coercive" effect of the government's preventive services regulations on Wheaton's decision as the source of Wheaton's present injury. (8/23 Tr. at 12; *see id.* at 8–13, 18, 32–33, 39.) However, "allegations of chilling injury are not sufficient basis for standing to challenge a government action, at least when the chill is 'subjective' and not substantiated by evidence that the government action *has a present and concrete effect*." *Salvation Army*, 919 F.2d at 193

(emphasis added) (quoting *Laird*, 408 U.S. at 13) (collecting cases)). Indeed, the Supreme Court has emphasized that while its precedent

> recognize[s] that governmental action may be subject to constitutional challenge even though it has only an indirect effect on the exercise of First Amendment Rights, . . . these decisions have in no way eroded the 'established principle that to entitle a private individual to invoke the judicial power to determine the validity of executive or legislative action he must show that he has sustained, or is immediately in danger of sustaining, a direct injury as the result of that action . . . .'

*Laird*, 408 U.S. at 13 (quoting *Ex parte Levitt*, 302 U.S. 633, 634 (1937)). Wheaton has "not [met] this test; [its] claim, simply stated, is that [it] disagree[s] with the judgments made by the Executive Branch with respect to" what preventive services health insurance plans must cover, "and that the very existence" of these regulations (notwithstanding the fact that they are presently in flux and that the government will not enforce them against Wheaton while they are being amended to address Wheaton's concerns) "produces a constitutionally impermissible chilling effect upon the exercise of [its] First Amendment Rights." *Id.* But "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm; 'the federal courts established pursuant to Article III of the Constitution do not render advisory opinions.'" *Id.* at 13–14 (quoting *United Pub. Workers of Am. (C.I.O.) v. Mitchell*, 330 U.S. 75, 89 (1947)).

Wheaton has not demonstrated that it has standing.

**II. RIPENESS**

In addition, Wheaton's claims are not ripe.[8] "In assessing the prudential ripeness of a case," courts consider two factors: "the 'fitness of the issues for judicial decision' and the extent

---

[8] Judges Urbom and Boasberg concluded the same as to the almost identical claims raised by the plaintiffs before them. *See Nebraska ex rel. Bruning*, 2012 WL 2913402, at *20–24; *Belmont Abbey College*, 2012 WL 2914417, at *10–15.

to which withholding a decision will cause 'hardship to the parties.'" *Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 387 (D.C. Cir. 2012) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977)).

Wheaton argues that its claims are fit for judicial decision because the preventive services regulations are binding legal rules that constrain Wheaton's choices with regard to the health insurance purchasing decisions. (Pl. Opp'n at 21–22, 26–27.) Having rejected a similar standing argument, the Court will reject Wheaton's ripeness argument as well. The two doctrines are closely related. *See Allen v. Wright*, 468 U.S. 737, 750 (1984); *Belmont Abbey College*, 2012 WL 2914417, at *10. Yet, they are motivated by somewhat different concerns. The standing doctrine reflects the constitutional imperative that "federal courts sit 'solely[] to decide on the rights of individuals,'" *Hein v. Freedom from Religion Foundation, Inc.*, 551 U.S. 587, 598 (2007) (quoting *Marbury v. Madison*, 1 Cranch 137, 170 (1803)), "and must 'refrai[n] from passing upon the constitutionality of an act . . . unless obliged to do so in the proper performance of [the] judicial function, when the question is raised by a party whose interests entitle him to raise it.'" *Id.* (alterations in the original) (quoting *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State*, 454 U.S. 464, 474 (1982)). By ensuring that plaintiffs have standing, courts enforce Article III's limitations on their own powers.

Ripeness, on the other hand, is also concerned with the *separation* of powers, particularly where agency review is concerned. In addition to preserving the proper role of courts under Article III, the ripeness doctrine "'prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also . . . protect[s] the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'" *Nat'l Park*

*Hospitality Ass'n v. Dep't of the Interior*, 538 U.S. 803, 807–08 (2003) (quoting *Abbott Labs.*, 387 U.S. at 148–49). The fitness requirement of the ripeness inquiry thus "protect[s] 'the agency's interest in crystallizing its policy before that policy is subjected to judicial review and the court's interests in avoiding unnecessary adjudication and in deciding issues in a concrete setting.'" *Am. Petroleum Inst.*, 683 F.3d at 387 (quoting *Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 49 (D.C. Cir. 1999)). As such, the "fitness of an issue" depends in large part on "'whether the agency's action is sufficiently final.'" *Id.* (quoting *Atl. States Legal Found. v. EPA*, 325 F.3d 281, 284 (D.C. Cir. 2003)).

> *Courts decline to review "tentative" agency positions because doing so "severely compromises the interests" the ripeness doctrine protects*: "The agency is denied full opportunity to apply its expertise and to correct errors or modify positions in the course of a proceeding, the integrity of the administrative process is threatened by piecemeal review of the substantive underpinnings of a rule, and judicial economy is disserved because judicial review might prove unnecessary if persons seeking such review are able to convince the agency to alter a tentative position."

*Id.* (emphasis added) (quoting *Pub. Citizen Health Research Grp. v. FDA*, 740 F.2d 21, 31 (D.C. Cir. 1984)).

Because they are in the process of being amended, *see* 77 Fed. Reg. at 16,501 (ANPRM), the preventive services regulations are by definition a tentative agency position "'in which the agency expressly reserves the possibility that its opinion might change.'" *Birdman v. Office of the Governor*, 677 F.3d 167, 173 (3d Cir. 2012) (internal quotation marks and alterations omitted) (quoting *Natural Res. Defense Council v. FAA*, 292 F.3d 875, 883 (D.C. Cir. 2002)).[9]

---

[9] Wheaton protests that its "challenge to the [preventive services regulations] raises questions of law largely independent of context-specific facts" (Pl. Opp'n at 22), and that "if the issue raises a purely legal question . . . [courts] assume its threshold suitability for judicial determination." *Eagle-Picher Indus. v. EPA*, 759 F.2d 905, 915 (D.C. Cir. 1985). However, even were the Court to agree that Wheaton's claims are purely legal, that does not end the inquiry. After deciding

The ANPRM is "'clearly not some non-substantive, thinly veiled attempt [by defendants] to evade review.'" *Belmont Abbey College*, 2012 WL 2914417, at *13 (quoting *Am. Petroleum Inst.*, 683 F.3d at 388); *accord Nebraska ex rel. Bruning*, 2012 WL 2913402, at *23 (the fact that the preventive services regulation itself "describes the temporary enforcement safe harbor," and that the agencies have undertaken "a new proposed rulemaking[,] dispels the notion that the defendants are engaged in review-evading gamesmanship").[10] And the fact that defendants may have settled on a definition of the "religious employers" that will be exempted from certain of the preventive services requirements[11] is irrelevant given that the requirements themselves are anything but final. *See id.* at *22.

---

that an "issue raises a purely legal question," courts must still "consider whether the agency or the court will benefit from deferring review until the agency's policies have crystallized and the 'question arises in some more concrete and final form.'" *Eagle-Picher Indus.*, 759 F.2d at 915 (quoting *Abbott Labs.*, 387 U.S. at 149); *see Belmont Abbey College*, 2012 WL 2914417, at *14 ("courts should refrain from 'intervening into matters that may best be reviewed at another time or in another setting,' even if the issue presented is 'purely legal'" (quoting *Full Value Advisors v. SEC*, 633 F.3d 1101, 1106 (D.C. Cir. 2011)).

[10] Defendants have taken significant steps toward revising the preventive services regulations:

> They have published their plan to amend the rule to address the exact concerns [p]laintiff raises in this action and have stated clearly and repeatedly in the Federal Register that they intend to finalize the changes before the enforcement safe harbor ends. . . . Not only that, but [d]efendants have already initiated the amendment process by issuing an ANPRM. . . . The government, moreover, has done nothing to suggest that it might abandon its efforts to modify the rule—indeed, it has steadily pursued that course—and it is entitled to a presumption that it acts in good faith. *See* . . . *Comcast Corp. v. F.C.C.*, 526 F.3d 763, 769 n.2 (D.C. Cir. 2008) ("We must presume an agency acts in good faith . . . .").

*Belmont Abbey College*, 2012 WL 2914417, at *9 (some internal quotation marks and citations omitted).

[11] In addition, counsel for the defendants stated at oral argument that the ANPRM "certainly doesn't foreclose changing the religious employer exemption." (8/23 Tr. at 27.)

Moreover, the regulations Wheaton challenges are being amended precisely in order to accommodate Wheaton's concerns. *See AT&T Corp. v. FCC*, 369 F.3d 554, 563 (D.C. Cir. 2004) (per curiam) (dismissing challenge as unripe because of "ongoing rulemaking proceedings . . . address[ing] the issues raised by [petitioner]"). Wheaton only tilts at windmills when it protests that it will not be satisfied with whatever amendments defendants ultimately make. Indeed, Wheaton's argument that various hypothetical accommodations are insufficient (*see* Pl. Opp'n at 16–17, 19, 23–26) only serves to underscore why this Court ought not address the merits of Wheaton's claims until the preventive services regulations "have taken on fixed and final shape so that [the Court] can see what legal issues it is deciding." *Pub. Serv. Comm'n v. Wycoff Co.*, 344 U.S. 237, 244 (1952).

Nor has Wheaton demonstrated a hardship from any delay that would override its claims' lack of fitness for judicial review. *See Am. Petroleum Inst.*, 683 F.3d at 389 ("Considerations of hardship that might result from delaying review 'will rarely overcome the finality and fitness problems inherent in attempts to review tentative positions.'" (quoting *Pub. Citizen Health Research Grp.*, 740 F.2d at 31)). "Costs stemming from [Wheaton's] desire to prepare for contingencies are not sufficient . . . to constitute a hardship for purposes of the ripeness inquiry—particularly when [defendants'] promises and actions suggest the situation [Wheaton] fears may not occur." *Belmont Abbey College*, 2012 WL 2914417, at *14 (collecting cases). And "[t]he planning insecurity [Wheaton] advances" with regard to what the preventive services regulations may (or may not) require of it does not suffice to show hardship. *Tenn. Gas Pipeline Co. v. FERC*, 736 F.2d 747, 751 (D.C. Cir. 1984).

**CONCLUSION**

"In sum, the application of" the preventive services regulations to Wheaton "remains

hypothetical." *Id*. Wheaton's arguments do not

> set its case apart from the mine run of situations in which an enterprise confronts . . . projected application of regulatory or fiscal legislation. Were [courts] to entertain anticipatory challenges pressed by parties facing no imminent threat of adverse agency action, no hard choice between compliance certain to be disadvantageous and a high probability of strong sanctions, . . . [they] would venture away from the domain of judicial review into a realm more accurately described as judicial preview. No roving preview function has been assigned to courts in the federal system.

*Id.* (citations omitted).

Defendants' motion to dismiss on jurisdictional grounds will be granted. A separate Order accompanies this Memorandum Opinion.

/s/
ELLEN SEGAL HUVELLE
United States District Judge

Date: August 24, 2012